ANDREW CRAWFORD, *by his next friend, etc.*

*v.*

CLARENCE RIDGELY

(No. 10854)

Submitted September 17, 1957. Decided December 3, 1957.

*Handlan, Garden, Matthews & Hess, Lester C. Hess,* for appellant.

*Patrick J. McGuire,* for appellee.

BROWNING, JUDGE:

Andrew Crawford, hereinafter referred to as plaintiff, brought this suit in equity in the Circuit Court of Ohio County, by his next friend Catherine C. Roth, to set aside, cancel and hold for naught a release, executed and delivered to defendant's insurance adjuster, on the ground of mental incompetence to understand the nature and effect of the release, whatever representation, statements or pretenses made by defendant's adjuster being confined to a private conversation with the plaintiff, during which it should have been apparent that plaintiff lacked mental capacity to understand a release, and to enjoin and restrain defendant and his at-

torneys from interposing, as a defense in an action at law previously instituted by the plaintiff against the defendant, such release and special pleas of release and accord and satisfaction based thereon.

The case was tried by the court upon the bill and answer, the answer denying plaintiff's mental incompetence to understand and execute the release, that there were any pretenses, misrepresentations or misstatements, or any private conversations, and further alleging that plaintiff has failed to return, or offer to return, to the defendant, the consideration for the release. The court found the allegations of the bill were sustained and granted the relief as prayed for, to which decree this Court granted an appeal and supersedeas on October 1, 1956.

The facts are relatively uncomplicated. Plaintiff, a pedestrian, was struck by an automobile owned and operated by the defendant, Ridgely on November 7, 1953. He sustained a stellate fracture of the skull necessitating six weeks hospitalization, during which time he developed a phlebothrombosis. All witnesses agree that plaintiff is mentally deficient disagreeing only as to the extent of such deficiency. On January 19, 1954, plaintiff was approached by defendant's insurance adjuster, and the release in controversy executed, in the presence of two persons who witnessed plaintiff's mark, for a consideration of $625.00. This $625.00 was broken down into three parts and three drafts were issued: One in the amount of $398.72, payable jointly to plaintiff and Wheeling Hospital covering plaintiff's hospital bill in full; one in the amount of $200.00, payable jointly to plaintiff and Dr. Louis Farri covering the professional services of Dr. Farri in connection with the injury; and the third in the amount of $26.28, payable solely to the plaintiff. The latter draft may be further broken down as follows: $20.00 for damages to plaintiff's clothing; $5.00 for damage to or loss of plaintiff's hat; and $1.28 in order to make the round figure of $625.00. The three drafts were delivered to Mrs. Ludwig, one of

the witnesses present, and also the person in whose home plaintiff was residing. She obtained plaintiff's endorsements, properly witnessed, mailed the proper drafts to the hospital and Dr. Farri, cashed the third with which she paid her son-in-law $20.00 for a suit of clothes which he had outgrown, purchased a hat, and turned the remainder over to the plaintiff.

The first assignment of error is that the lower court erred in failing to hold that plaintiff could not maintain the instant suit when he had not returned, or offered to return, the consideration given for the release. Defendant's insurance adjuster testified that neither plaintiff nor any representative of plaintiff had offered to return to him the amount paid for the release at any time. At this point, plaintiff's counsel interjected the statement that the offer was made and extended in plaintiff's bill of complaint. The closest scrutiny of the bill of complaint fails to reveal any such offer and the question of whether such offer is necessary, where releasor is a mental incompetent, has not been briefed by counsel for plaintiff.

The remaining assignments of error relate to the court's holding in the final decree that: "The allegations of the Bill of Complaint are fully sustained and that at the time of the execution of the Release complained of, the plaintiff, Andrew Crawford, lacked the mental capacity to understand and protect his interest in the making and execution of a contract. * * *" As heretofore stated, all witnesses, both for plaintiff and defendant, testified that plaintiff was mentally deficient, though disagreeing as to his ability to understand the nature of the release if such were properly explained to him.

Dr. Robert J. Reed, Jr., a witness for plaintiff, stated: "it was obvious he [plaintiff] was underdeveloped mentally.", but that he believed that, if the release were read to plaintiff, and explained to him, plaintiff would be mentally capable of understanding it. Cornell Peter Monda, an accredited psychologist, stated that he had given plaintiff a psychological examination

known as the Wexler-Belleview intelligence scale for adults. Monda stated that plaintiff's mental age had never exceeded that of a five year old child; that he was "not educable—cannot profit from experience"; and, in answer to a question as to plaintiff's mental ability to fend for himself in the making of a legal contract, that "I would answer that in a most definite way—definitely not. He is a mental incompetent."

Dr. William T. Booher testified that he had examined the plaintiff and that in his opinion plaintiff's mentality would be less than seven years. He also stated that he doubted whether plaintiff could understand the simplest phraseology of a very short contract if it were explained fully to him, but that it might be possible. Dr. Booher further stated: "What I am trying to get at is, you could say a hundred thousand dollars to him or a hundred dollars, it probably wouldn't make any difference, he would still understand he couldn't come back for any more money. He doesn't know what money—or what the settlement means.", and again "He would understand that he couldn't come back for any more money. Whether he knows what $625. is or not, I don't know that."

In regard to the actual execution of the release, the defendant's insurance adjuster testified that: On January 19, 1954, he approached the Ludwig farm where plaintiff lived; this was the first time he had met plaintiff; he told plaintiff he had come to settle plaintiff's claim; he produced the hospital and doctor bills, which he had in his possession, and asked plaintiff if there were any others; plaintiff replied that he knew of none; Mrs. Ludwig was present up to this point, then excused herself; he pointed to the word "Release" in red letters and read the release to plaintiff; he explained who Ridgely was, and what he had to do with it; plaintiff then said "Yes, I understand that you are making a complete settlement of my claim against the man that hit me"; he again went over the release in "everyday language"; Mrs. Ludwig returned and asked plaintiff

if he had informed the adjuster about the damaged clothing, and plaintiff replied that he had not; those figures were set by Mrs. Ludwig; he asked plaintiff if the payment of the hospital, doctor and clothing bills would be enough, or if he had another figure in mind; plaintiff replied: "No. That is all I want. I will be glad to have only the bills and my clothes paid. I don't want anything else. I am only glad everything will be taken care of, and I will sign the release."; he again told plaintiff of the total amount, and asked for signatures; he then found out plaintiff was unable to write and asked Mrs. Ludwig and a Mrs. Wilson to witness plaintiff's mark; he felt plaintiff could make a valid contract, and understood definitely what it was about; he felt it was a fair settlement; he knew it was a personal injury settlement; and he did not advise plaintiff that he had any claim for personal injuries, or specifically ask if he made any claim for personal injuries.

Mrs. Maria Ludwig testified: Plaintiff can do farm work under supervision, he is good with animals; she was present at the times the defendant's insurance adjuster stated; the release was explained to plaintiff; "He told him it was a final settlement. Now, how much he comprehended of that I wouldn't want to say definitely, but, then I asked myself—"; she then explained it to plaintiff twice; in her opinion, he understood it and "he was happy to have the bills paid"; she asked the adjuster if he would allow for the damaged clothing, and priced them at what she thought she could get them for; and, she thought plaintiff understood it was a full settlement. Mrs. Wilson testified that plaintiff "seemed to" understand that it was a final settlement.

There is no evidence that plaintiff was ever advised by anyone, or realized of his own limited knowledge, that he had even a questionable claim for damages against the defendant.

This Court finds no merit in the assignments of error relating to the finding of fact by the trial chancellor that the plaintiff was mentally incapable of understand-

ing the purport of the release which he signed. The trial chancellor heard the witnesses, and the release itself is in evidence. We find that he was not clearly wrong in his finding in that regard. However, a more difficult issue is presented by this record, inasmuch as it clearly shows that the plaintiff did not repay the $625.00 which he received as consideration for executing the release, nor did he offer to do so in his bill or at any other time.

The defendant relies upon the case of *McCary* v. *Monongahela Valley Traction Company*, 97 W. Va. 306, 125 S. E. 92, and especially the 2nd syllabus point thereof which reads: "In an action for damages for personal injuries, plaintiff cannot repudiate a written release of all claims arising out of his injuries, on the ground of fraud or mental incompetency to contract, without returning everything of value received by him in consideration for the release, or offering to do so." In that case, the plaintiff instituted an action to recover damages for personal injuries received by the alleged negligence of the Traction Company. The defendant interposed a plea of accord and satisfaction, setting up a release executed by the plaintiff similar to the one executed by the plaintiff in this case. In the *McCary* case, the plaintiff filed three special replications. The first special replication alleged that the release mentioned in defendant's special plea was obtained by fraud and misrepresentation on the part of the defendant, and that the supposed sum mentioned therein was in fact a donation or gift; the second special replication, that plaintiff was, at the time of the execution of the release, "incapable of understanding the nature and comprehending the meaning and effect of said purported paper writing, and that he was still suffering from the effects of the injuries inflicted upon him by defendant, and was wholly incapable of transacting business or of entering into a contract of release"; and the third special replication, that the release was obtained from him without adequate consideration. The Court disposed of No. 3 by stating: "* * * A valuable consideration, however small and nominal, if given or stipulated for in good

faith, in the absence of fraud, is sufficient to sustain a contract. * * *", citing authority. With reference to the second special replication, the Court stated: "The second special replication charges mental incapacity on the part of plaintiff to contract at the time the alleged release was executed. There was no tender or offer to return the money received by plaintiff as a consideration for the release pleaded, nor is it alleged that the amount received by the plaintiff was ever tendered to defendant at any time. The weight of authority seems to be, that if one seeks to rescind a settlement on the ground of fraud, mental incompetency or mistake, he must, after discovering the fraud or mistake, place the other party in *statu quo*, or offer to do so. * * *" Thereafter several cases and texts are cited. The Court in its opinion in further discussing the second special replication said: "Fraud is not alleged in this replication. * * *." "There are cases holding that it is unnecessary to return or tender the consideration in repudiating a release of damages for personal injury, where the release is alleged to have been secured by fraud. Some text writers attempt to reconcile the conflict in the decisions by dividing them into two classes—those in which the fraud is in the treaty, and those in which the fraud is in the factum. * * *" Lastly, the Court discussed the plaintiff's special replication number one, in which he alleged that the release in question "was obtained from said plaintiff by fraud and misrepresentation on the part of said defendant, through its servants and agents, they then and there at the time of the date of said paper writing representing to the plaintiff that said supposed sum of $325.00 in said paper writing mentioned was a donation or gift." The Court found that plaintiff's special replications numbers two and three should have been rejected, and that his special replication number one was not supported by the evidence. Thus it would appear that the Court held that the third special replication was demurrable, inasmuch as the inadequacy of the consideration was not a defense to the plea of accord and satisfaction, and held that the evidence did not support

special replication number one as to fraud. Apparently the Court held that the second special replication was also demurrable, inasmuch as it did not show that the plaintiff had returned, or offered to return, the consideration received from the defendant as a settlement of his claim. In discussing the second special replication, as heretofore quoted, the Court said: "The weight of authority seems to be, that if one seeks to rescind a settlement on the ground of fraud, mental incompetency or mistake, he must, after discovering the fraud or mistake, place the other party in *statu quo*, or offer to do so.", and in the 2nd syllabus point, there is no distinction made between a release secured by fraud in the procurement or in the inducement, the statement being made that a plaintiff cannot repudiate a release on the grounds of fraud or mental incompetency without returning everything of value received by the releasor, or offering to do so. However, in the subsequent case of *Janney* v. *The Virginian Railway Company*, 119 W. Va. 249, 193 S. E. 187, the only syllabus point reads: "In the absence of fraud by an alleged tortfeasor in the procurement, for valuable consideration, of a release of liability for personal injury to another, such release may not be repudiated in an action at law by the releasor for damages for the injury."

In both the *McCary* and *Janney* cases, releases were attempted to be repudiated by special pleas in actions at law, while the plaintiff here seeks to repudiate the release in a court of equity. The rule requiring such person to make restitution, or offer to do so, seems applicable both in courts of law and equity. In 134 A. L. R., Tender As Condition Of Action—Release, Page 8, it is stated that: "The general principle that one who seeks to avoid the effect of a release or compromise of a claim, demand, or cause of action (whether in an action or proceeding brought solely to cancel or rescind the release or instrument of settlement, or in an action or proceeding brought primarily to enforce the original demand or cause of action, or in an action brought for the dual purpose of setting aside the release or settlement and recovering on the original

claim or demand) must first return or tender the consideration, whether money or property, paid him in connection with his execution of the settlement or release, has found application or recognition in a large number of cases involving the release or settlement of a wide variety of claims or demands." The rule laid down by this Court in the *McCary* case would seem to represent the great weight of authority. At Page 17, 134 A. L. R., scores of cases to that effect are cited from many jurisdictions, including the *McCary* case and *Carroll* v. *Fetty*, 121 W. Va. 215, 2 S. E. 2d. 521. However, in examining those cases individually, as well as a lesser number, which apparently are cited as representing the minority view, beginning on Page 41 of 134 A. L. R., it is to be observed that in many instances where the release is obtained by fraud in the execution, and in some instances fraud either in the procurement or the inducement, a different result is reached.

In 45 Am. Jur., Release, §53, it is said: "The general principle that one who seeks to avoid the effect of a release must first return or tender the consideration paid him in connection with his execution of the release, has found application or recognition in a large number of cases involving the release of a wide variety of claims or demands, as releases of claims for personal injuries or death * * *."

There is no allegation in the bill in the instant cause, nor is there any evidence to show that the plaintiff was by fraudulent representation induced to execute the release. The bill alleges that: "Plaintiff by his next friend, further respectfully represents that whatever representations, statements or pretenses made by the Agent aforesaid were confined to a private conversation between the two of them; that it was obviously apparent to or should have been apparent to this Agent or Adjuster that the Plaintiff lacked the mental capacity to understand or know the effect of the supposed Release; was incapable of making a valid contract and that the offer for the Plaintiff's injuries was grossly inadequate and was in no sense a proper remuneration for the damages and injuries inflicted." As heretofore stated, the decree merely found

that the plaintiff "lacked the mental capacity to understand and protect his interest in the making and execution of a contract * * *."

In this case, the plaintiff neither repaid the defendant the $625.00 received by him as a consideration for executing the release, nor did he in his bill, or at any time thereafter offer to do so. Therefore, we are constrained to reverse the decree of the Circuit Court of Ohio County and remand this cause to that court for such further proceedings as the parties may be advised.

*Reversed and remanded.*